

**SO ORDERED.**

**SIGNED this 28 day of March, 2013.**

*Stephani W. Humrickhouse*
_____
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

| | |
|---|---|
| **IN RE:** | **CASE NO.** |
| **ANDERSON HOMES, INC., and** | **09-02062-8-SWH** |
| **VANGUARD HOMES, INC.** | **09-02071-8-SWH** |
| **DEBTORS** | |

**RICHARD D. SPARKMAN, Chapter 7 Trustee for**
**Anderson Homes, Inc. and Vanguard Homes, Inc.,**

| | |
|---|---|
| **Plaintiff,** | **ADVERSARY PROCEEDING NO.** |
| **v.** | **11-00213-8-SWH-AP** |

**AMERICAN RESIDENTIAL SERVICES, LLC,**

**Defendant.**

### ORDER REGARDING PREFERENCE DEFENSES

The matters before the court are the issues remaining for trial after resolution of the parties'

cross-motions for summary judgment in this preferential transfer action initiated by the chapter 7

trustee against American Residential Services, LLC ("ARS"), as well as ARS's motion for sanctions

based on spoliation of evidence. A trial was held on November 13, 2012, after which both parties

filed additional memoranda on January 25, 2013. For reasons set forth herein, the court will deny

ARS's motion for sanctions and also finds that the chapter 7 trustee is entitled to a judgment against ARS in the amount of $122,861.66, plus interest at the federal rate of 0.17 percent per annum from June 28, 2011 until paid.

## FACTS AND BACKGROUND

On March 16, 2009, Anderson Homes, Inc., Bridgewater Land Resource, LLC, Land Resource Group of Raleigh, Inc., and Vanguard Homes, Inc. ("Debtors") filed voluntary petitions seeking relief under chapter 11 and the cases were consolidated for administrative purposes by order dated March 25, 2009. On June 30, 2010, the cases were converted to chapter 7, and Richard D. Sparkman was appointed as chapter 7 trustee in each case.

This preferential transfer action was initiated by Mr. Sparkman as chapter 7 trustee for Anderson Homes, Inc., and Vanguard Homes, Inc. against ARS on June 28, 2011. The trustee sought to avoid certain transfers between the debtors and ARS totaling $186,419.35 which occurred during the 90-day preference period preceding March 16, 2009. Anderson made seven transfers by check to ARS during the preference period: check no. 16316 for $25,295.00 issued on December 12, 2008,[1] check no. 16528 for $62,236.44 issued on December 31, 2008, check no. 16688 for $31,852.52 issued on January 9, 2009, check no. 16770 for $20,829.20 issued January 23, 2009, check no. 16853 for $19,464.60 issued on January 30, 2009, check no. 16955 for $11,734.60 issued on February 6, 2009, and check no. 17178 for $15,006.99 issued on February 20, 2009.

---

[1] This check was issued outside of the 90-day preference period, but cleared Anderson's account during the preference period. The date that the check is honored is controlling in a preference analysis. See Order Regarding Motions For Summary Judgment, May 25, 2012 (Docket No. 46); Barnhill v. Johnson, 503 U.S. 393, 402 (1992).

ARS filed a motion for summary judgment on February 15, 2012, alleging that the trustee could not meet his statutory burden pursuant to § 547(b) to avoid the transfers and that ARS was entitled to judgment as a matter of law. ARS filed a second motion for partial summary judgment on February 21, 2012, alleging that if there were preferential transfers, it was entitled to a "new value" defense under 11 U.S.C. §547(c)(4) in the amount of $82,609.93. The trustee filed a cross-motion for partial summary judgment on February 28, 2012, with respect to the prima facie elements of his preference claim under § 547(b).

To resolve these motions for summary judgment, a consent order was entered on April 11, 2012, granting in part and denying in part ARS's second motion for summary judgment relating to whether it was entitled to a new value defense. The consent order provided that ARS had a valid new value defense under §547(c)(4) in the amount of $63,557.69, but that ARS was not entitled to such a defense for goods and services provided post-petition.[2] Subsequently, the court issued an order on May 25, 2012, denying ARS's first motion for summary judgment and allowing the trustee's cross-motion for partial summary judgment with respect to the prima facie elements of his preference claim under § 547(b). Accordingly, two issues remain for resolution by the court: (1) whether the contemporaneous exchange for new value defense under 11 U.S.C. §547(c)(1) applies to the preferential transfers, and (2) whether the ordinary course of business defense under 11 U.S.C. §547(c)(2) applies to the preferential transfers.[3]

---

[2] Evidently, ARS provided approximately $19,052.24 worth of goods and services post-petition to which the §547(c)(4) defense did not apply.

[3] ARS has filed a motion for sanctions based on spoliation of evidence. The court will necessarily decide this motion in determining whether ARS has a valid defense under 11 U.S.C. § 547(c)(1). Therefore, a separate order denying ARS's motion is not warranted.

Anderson and Vanguard have been involved in the development, construction and sale of residential properties since 1990. ARS provided heating, ventilation, and air conditioning (HVAC) services along with miscellaneous related work to Anderson throughout the course of their 28-year business relationship. From 1987 to 2008, ARS provided most of the HVAC installation and related services for Anderson. Anderson did employ other HVAC contractors, and those contracts contained similar terms to those in its contract with ARS.

ARS provided HVAC services to Anderson in three stages: (1) rough in, (2) trim and (3) start up. During the rough in stage, ARS would provide the duct work related to the HVAC installation early in the construction process. Sixty percent of the total job price was paid after the rough in work was completed. The trim stage took place towards the end of construction, usually two to three months after rough in, and ARS would install the HVAC equipment at this point. ARS's policy was not to begin trim work until it had been paid for the rough in work. The remaining forty percent of the job price was paid after the trim work was completed. The start up work involved turning on the HVAC equipment once the construction was completed, and took place immediately prior to the closing of the home sale to a third party, making ARS one of the last subcontractors on any given job site.[4] The start up work was not billed separately and was included in the billing for the trim work. Testimony at trial from both ARS and Anderson established that the preference payments from Anderson to ARS were for payments owed on these HVAC services.

Once a year, ARS would send Anderson an updated price list for its services. Beginning in the early to mid 2000s, Anderson switched to an electronic purchase order system which ARS could

_____

[4] While February 20, 2009 was the date of the last preference payment, ARS began filing lien claims against Anderson after that date for amounts past due.

4

access.  If ARS was selected to provide HVAC services for a property, Anderson would contact ARS through the purchase order system and generate a purchase order for the rough in work. Anderson would generate a second purchase order when it was time for the trim.  These purchase orders reflected the yearly price updates that ARS provided to Anderson.  Anderson would contact ARS through the purchase order system to complete the start up, but no purchase order was generated at that point.  ARS frequently checked Anderson's in-house computer system because of the volume of business between the two companies.

Payments to ARS were based solely on the purchase orders generated by Anderson's in-house computer system, and not based on invoices provided to Anderson by ARS after the work was completed.  An Anderson supervisor would provide a report to the accounting department detailing the progress on each project, and this report would determine the time of payment to ARS.  ARS did sometimes provide invoices to Anderson, but those were not relied on for payment purposes. If any other work was provided by ARS aside from the HVAC services (such as removing rocks from sewer pipes or providing backflow certification), payment for those services was usually added as invoice credits on the check stubs.  These services typically were not included in Anderson's original purchase order.

Certain concessions were included in the payment arrangement between ARS and Anderson. Prior to October 31, 2008, if Anderson paid within 30 days plus a 15-day grace period, it would be entitled to a 1.5% concession on the purchase price and an equipment discount.  Anderson was no longer entitled to the 1.5% concession after October 31, 2008.  The only remaining concession was for the equipment discount: a 2.5% discount for heat pump systems, and a 1.75% discount on gas systems.  Anderson indicated that a 30-day payment window with a 15-day grace period was a

typical payment term similar to what it enjoyed with other contractors. ARS indicated that builders typically paid for rough in work within 45 to 60 days, so that the rough in was paid for before the trim work needed to be completed.

The seven preference payments were in the form of checks issued by Anderson to ARS between December 12, 2008, and February 20, 2009. Copies of the checks numbered 16316, 16528, and 17178 were submitted along with invoice lists reflecting the purchase order dates. Copies of the checks and check stubs for checks numbered 16688, 16770, 16853, and 16955 were not available, so ARS submitted screen shots of the invoices relating to those preference payments. ARS also offered a summary of pre-preference payments based on Anderson's checks and invoice lists. This summary included copies of all of the checks (with attached check stubs) that Anderson generated and sent to ARS during the period from January 1, 2007, through December 5, 2008. The summary of these pre-preference payments included the number of days between the purchase order date and the payment date.[5]

## DISCUSSION

Section 547(b) allows a trustee to avoid certain transfers made by a debtor to unsecured creditors during the 90-day period prior to the bankruptcy petition date (the preference period). See 11 U.S.C. § 547(b). The trustee has the burden of proving the avoidability of an allegedly preferential transfer by meeting the five statutory requirements set out in section 547(b). 11 U.S.C.

---

[5] Even though some of the payment delays are calculated based on the invoice date, as compared to the purchase order date, it is still possible to compare these delays. Trial testimony indicated that the purchase orders were almost always issued before the invoices, and that the purchase order date and the invoice date were typically within a week of each other. See Br. P. 19. Therefore, the delay in payment for the preference checks based on the invoice dates (checks no. 16688, 16770, 16853, and 16955) would likely be greater if the purchase order dates were available, since those would likely be earlier than the invoice date.

§ 547(g).  Here, the court issued an order on May 25, 2012 allowing the trustee's cross-motion for partial summary judgment with respect to the prima facie elements of the preference claim under §547(b).  See Order Regarding Motions For Summary Judgment, May 25, 2012 (Docket No. 46).

Section 547(c) provides several affirmative defenses to avoidance of a preferential transfer. The creditor has the burden of proving the nonavoidability of a preferential transfer due to an affirmative defense.[6]  11 U.S.C. § 547(g).  The only remaining issues for the court are ARS's contemporaneous exchange for new value defense under 11 U.S.C. § 547(c)(1) and ARS's ordinary course of business defense under 11 U.S.C. § 547(c)(2).

ARS contends that the preferential transfers are not avoidable pursuant to 11 U.S.C. § 547(c)(1) because the transfers were intended to be, and in fact were, contemporaneous exchanges for new value.  Additionally, ARS contends that the preferential transfers are not avoidable because the underlying transfers were made in the ordinary course of business between the parties or because the transfers were made pursuant to ordinary business terms.  See 11 U.S.C. § 547(c)(2).

### 11 U.S.C. § 547(c)(1) - Contemporaneous Exchange for New Value

According to the contemporaneous exchange for new value defense, a preferential transfer is not avoidable

> to the extent that such transfer was - (A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a

---

[6] The Fourth Circuit recently held in Environmental Specialists, Inc., that the party with the burden of proof in a contemporaneous exchange for new value defense must also "prove with specificity the new value given to the debtor." Campbell v. The Hanover Ins. Co. (In re ESA Envtl. Specialists, Inc.), 2013 WL 765705 at *6 (4th Cir. Mar. 1, 2013) (citing Jet Fla., Inc. v. Am. Airlines, Inc. (In re Jet Fla. Sys., Inc.), 861 F.2d 1555, 1559 (11th Cir. 1988)).  That party need only show that the new value "had a value at least as great as the amount of the alleged preferential transfer."  Id. at *7.  However, the court determines the new value defense here fails for other reasons.

7

contemporaneous exchange for new value given to the debtor; and
(B) in fact a substantially contemporaneous exchange[.]

11 U.S.C. § 547(c)(1).  In relation to this section, "new value" is defined as

money or money's worth in goods, services, or new credit, or release
by a transferee of property previously transferred to such transferee
in a transaction that is neither void nor voidable by the debtor or the
trustee under any applicable law, including proceeds of such
property, but does not include an obligation substituted for an
existing obligation[.]

11 U.S.C. § 547(a)(2).  ARS asserts that it is entitled to establish that the payments to it constituted

a contemporaneous exchange of new value by showing (1) that it would have timely filed a claim

of lien with respect to the properties where it had potential lien claims, and (2) if ARS had filed lien

claims, there was sufficient equity in the property that ARS would have been paid in full in a

hypothetical Chapter 7 bankruptcy filed at the time of each preference payment.  See Kiddco, Inc.

v. Callaway, 2010 U.S. Dist. LEXIS 144571, at *15 (E.D.N.C. Mar. 16, 2010); Angell v. Ray J.

Pennington, Inc., 2008 Bankr. LEXIS 1994, at * 8 (Bankr. E.D.N.C. Mar. 20, 2008); Cf. United

Rentals, Inc. v. Angell, 592 F.3d 525, 534 (4th Cir. 2010).

        In light of the Fourth Circuit's decision in United Rentals, there is some uncertainty as to

whether the Pennington two-part test for showing a contemporaneous exchange for new value by

an indirect transfer – through the release of inchoate mechanic's lien rights – is still valid.  See

United Rentals, Inc. v. Angell, 592 F.3d 525, 534 (4th Cir. 2010); Angell v. Ray J. Pennington, Inc.,

2008 Bankr. LEXIS 1994, at *8 (Bankr. E.D.N.C. Mar. 20, 2008).  However, because the court finds

that ARS's contemporaneous exchange for new value defense fails on other grounds, the court will

not reach that issue.  Those grounds are ARS's inability to make use of the spoliation inference, and

its inability to establish the "intent" component of a contemporaneous exchange, as discussed below.

To be entitled to an adverse inference based on spoliation of evidence, the party seeking such an inference must first establish the "required elements of spoliation," which are as follows:

> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed 'with a culpable state of mind'; and (3) that the destroyed evidence was 'relevant' to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

Cytec Carbon Fibers LLC v. Hopkins, 2012 U.S. Dist. LEXIS 173247, at *4-5 (D.S.C. Oct. 22, 2012) (citing Residential Funding Corp. v. DeGeorge Fin. Corp., 306 F.3d 99, 107-08 (2d Cir. 2002)); Teague v. Target Corp., 2007 U.S. Dist. LEXIS 25368, at 5 (W.D.N.C. April 4, 2007). Further, as the Fourth Circuit has stated, an adverse inference "cannot be drawn merely from his [the party accused of spoliation] negligent loss or destruction of evidence; the inference requires a showing *that the party knew the evidence was relevant* to some issue at trial and that his willful conduct resulted in its loss or destruction." Hodge v. Wal-Mart Stores, Inc., 360 F.3d 446, 450 (4th Cir. 2004) (citations omitted) (emphasis added).

In this case, even if Pennington's two-part test is still valid, ARS admits that without a spoliation inference, it will not be able to satisfy the second part of the test and show that it would have been paid in full had it filed lien claims.  (Br. D. 10) ("ARS contends that it is entitled to a 'spoliation inference' that there was sufficient equity in some (or all) of the Preferenced Payment Lots for it to have been paid in full if it had filed claims of lien with respect to the Preference Lots.");[7] see also  Defendant's Spoliation Motion, November 11, 2012 (Docket Entry No. 56).

---

[7]As cited in the contemporaneous exchange for new value section, "Br. D." refers to ARS's post-trial memorandum supporting judgment in its favor on the 11 U.S.C. § 547(c)(1) defense.

9

ARS has failed to satisfy the elements of spoliation. The preference payments took place from December 2008 to February 2009; however, the documents destroyed related to the time period "prior to tax year 2008." See Order Authorizing Bankruptcy Trustee to Destroy Archived Books and Records, August 26, 2010 (Docket Entry No. 761, Case No. 09-02062-8-SWH). Thus, contrary to ARS's assertions, the destroyed documents were not relevant to show that ARS would have been paid in full.

Further, the documents that ARS sought through discovery to prove its § 547(c)(1) defense were destroyed in August of 2010 on motion of the Trustee, and with permission of the court. Id. Those documents were destroyed prior to the complaint being filed, and as ARS acknowledges in its post-trial memorandum, the trustee "may not have been consciously aware that the documents to be destroyed would be necessary for preference defendants to defend against his claims." Br. D. 14. ARS has the burden to show that "the party [the trustee] *knew* the evidence was relevant to some issue at trial." Hodge, 360 F.3d at 450. Here, ARS has failed to provide sufficient evidence for the court to even infer that the trustee may have had such knowledge.

Finally, ARS could also have sought this information in other ways, such as by seeking discovery from the cross-collateralized lenders regarding the properties and the extent of the liens of those lenders.[8] While ARS contends that the documents destroyed were relevant to establishing the amount of equity, if any, in each of the preference lots, that evidence was only relevant to ARS's ability to assert a § 547(c)(1) defense. Because it cannot establish the elements necessary to support the inference of spoliation, ARS could not satisfy the second prong of the Pennington test.

---

[8] The fact that the properties were cross-collateralized also indicates that there was no equity in them. The court need not address that issue, however, because ARS has failed to satisfy its burden regarding the spoliation of evidence for other reasons.

Likewise, even if ARS were able to satisfy the <u>Pennington</u> test, it could not establish the intent component of a contemporaneous exchange. In addition to showing that preference payments were *in fact* contemporaneous exchanges for new value, a creditor must also demonstrate that the payments were *intended* to be contemporaneous exchanges for new value to establish a § 547(c)(1) defense. <u>See</u> 11 U.S.C. § 547(c)(1)(A); <u>United Rentals, Inc.</u>, 592 F.3d at 533. While ARS contends that Anderson generally paid for the HVAC services before the property closed in order to obtain a lien waiver, it is clear from the evidence submitted by both parties that these payments were intended for past services rendered and not to obtain a lien waiver. David Servoss, Anderson's CEO, and Marie Crawford, ARS's Division Controller, both testified at trial that the payments from Anderson to ARS during the preference period were for HVAC services that ARS *had already provided* to Anderson. Because the evidence shows that these payments were for previously performed work, they could not therefore have been intended to be contemporaneous exchanges for new value.

In summary, even if the two-part <u>Pennington</u> test is still valid, ARS has admitted that it cannot prove the second part of that test without a spoliation inference and, as previously explained, ARS has failed to establish that such an inference is warranted. Further, ARS's own employee testified at trial that the payments made by Anderson to ARS during the preference period were for pre-existing debts and were not intended by the parties to be contemporaneous exchanges for new value. As such, ARS has failed to meet its burden under 11 U.S.C. § 547(g) to show that the preference payments were contemporaneous exchanges for new value under § 547(c)(1).

### 11 U.S.C. § 547(c)(2) - Ordinary Course of Business

According to the ordinary course of business defense, a preferential transfer is not avoidable

> to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was - (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or (B) made according to ordinary business terms[.]

11 U.S.C. § 547(c)(2).

Prior to 2005, the ordinary course of business defense was a three-part conjunctive test.  See 11 U.S.C. § 547(c)(2) (1994).  It was amended by the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") and became a disjunctive test in its current form.  The statute now allows either § 547(c)(2)(A) or § 547(c)(2)(B) to be used independently from the other subsection as an ordinary course of business defense.  The creditor must prove either that the preferential transfer was made in accordance with the standard practice between the parties *or* that the transfer was made in accordance with industry norms.  ARS relies on both tests to establish an ordinary course of business defense.  The court will evaluate each in turn.

The ordinary course of business between the parties under § 547(c)(2)(A) is a subjective test, focusing on the particular relationship between the two parties.  The Fourth Circuit previously adopted a "sliding-scale" approach to determine the ordinary course of business between two parties. Advo-System, Inc. v. Maxway Corp., 37 F.3d 1044, 1049-50 (4th Cir. 1994) (adopting the approach used in Fiber Lite Corp. v. Molded Acoustical Prods., Inc., 18 F.3d 217 (3d Cir. 1994)).  A critical factor in the sliding-scale approach is the length of the pre-bankruptcy debtor-creditor relationship: "'[T]he more cemented (as measured by its duration) the pre-insolvency relationship between the debtor and the creditor, the more the creditor will be allowed to vary its credit terms from the

12

industry norm[.]'" Id. at 1049 (quoting Molded Acoustical, 18 F.3d at 225). But "'[w]hen the relationship between the parties is of recent origin, or formed only after or shortly before the debtor sailed into financially troubled seas, the credit terms will have to endure a rigorous comparison to credit terms used generally in a relevant industry.'" Id. The Fourth Circuit's holding in Advo-System is still instructive in analyzing an ordinary course of business defense, even though it predates the BAPCPA amendments. See Sparkman v. Queenscape (In re Anderson Homes, Inc.), 2012 WL 5617446 at * 3 (Bankr. E.D.N.C.). In addition to the length of the relationship between the parties, this court has also examined "the prior course of dealing between the parties, the amount and timing of the payment, and the circumstances surrounding the payment." In re Day Telecomms., Inc., 70 B.R. 904, 910 (Bankr. E.D.N.C. 1987) (citing In re White, 58 B.R. 266, 269 (Bankr. E.D. Tenn. 1986)).

Despite the fact that the parties had a 28-year business relationship, the evidence presented at trial to illustrate the course of dealing between the parties during the pre-preference period covers roughly a two-year span. ARS offered a summary of the pre-preference payments based on Anderson's checks and invoice lists, which included copies of all of the checks (with attached check stubs) that Anderson generated and sent to ARS from January 1, 2007, through December 5, 2008. This summary of the pre-preference payments indicated that the average payment delay from the purchase order date to the payment date was 48.83 days (ranging from a delay of 19 days to a delay of 75.18 days). During the preference period, the payment delays ranged from 82.17 days to 111.8 days after the purchase order or the invoice if all of the payments are considered. See Br. P. 22. If the disputed entries are excluded, the payment delays ranged from 86.6 days to

13

109.25 days.[9]  The  average delay was 95.23 days (considering all payments), and 96.26 days if the

disputed entries are excluded.  If all entries are considered, this represents a 95.02% increase in

payment delay from the pre-preference period.  If the disputed entries are excluded, this represents

a 97.13% increase in payment delay.  This court has held in the past that an increase in payment

delay of 123.89% from the pre-preference period was not within the ordinary course of business

between the parties.  Queenscape,  2012 WL 5617446 at * 4.   Cf. Angell v. Neff Rental, Inc.,

No. 06-00157-8-AP (Bankr. E.D.N.C. Jan. 23, 2008) (holding that an increase in payment delay of

15.99% from the pre-preference period was within the ordinary course of business between the

parties).  Here, an increase  of either 95.02% or 97.13% represents a "substantial change in the

parties' dealings during the Preference Period from the pre-preference period."  Queenscape, 2012

WL 5617446 at *4.

        The court also considers any change in circumstances that may have occurred between ARS

and Anderson.  "[A] change in the payment terms during or immediately prior to the Preference

Period is a significant deviation" from the previous relationship between the parties.  Id. at *6

(detailing cases in other jurisdictions where a change in payment terms during this time precluded

an ordinary course of business defense).  Here, prior to October 31, 2008, Anderson received certain

concessions from ARS if it paid within 30 days plus a 15-day grace period.  It received an equipment

discount of 2.5% on heat pump systems and 1.75% on gas systems, and a 1.5% concession on the

purchase price.  For all invoices paid after October 31, 2008, Anderson was no longer entitled to the

---

[9] ARS highlighted certain invoices in its trial exhibits that had adjustments or credits that did
not reflect the rough in or the trim work.  ARS contends these entries should not be included in
calculating the average delays.  Even if those entries are excluded, the average delay in payment
does not change materially.

1.5% concession on the purchase price.  The only remaining concession after this date was the equipment discount.  This change in the concessions provided by ARS to Anderson took place at the end of October 2008.  The preference period began in December 2008.  This change in the concessions that ARS provided to Anderson took place "immediately prior" to the preference period, and represents a "significant deviation" from the previous relationship between the parties.  Id.

In light of the fact that there was a significant increase in the delay of payment from the pre-preference period to the preference period, and because the change in concessions given by ARS to Anderson took place in the months immediately prior to the preference period, ARS has failed to meet its burden under 11 U.S.C. § 547(g) of showing that the payments were made according to the ordinary course of business between the parties under § 547(c)(2)(A).

The ordinary business terms defense under § 547(c)(2)(B) is an objective test.  The Fourth Circuit has stated that the ordinary business terms analysis "requires [the court] to look to the norm in the *creditor's industry* when determining whether preference payments were made according to ordinary business terms."  Advo-System, 37 F.3d at 1048 (emphasis added).  In Advo-System, the court required that "a creditor prove that the debtor made its pre-petition preferential transfers in harmony with the range of terms prevailing as some relevant industry's norms."  Id. At 1050.  "In proving what is standard in a given industry, the creditor is not required to prove a rigorous definition or credit standard within the industry through evidence[.]"  Queenscape,  2012 WL 5617446 at * 7.  Instead, the creditor must "establish a 'range of terms' on which 'firms similar in some general way to the creditor' deal."[10]  Sass v. Vector Consulting, Inc. (In re Am. Home Mortg.

---

[10] In order to establish the industry standard for the purposes of the ordinary business terms defense in Neff Rental, Inc., "the court accepted an affidavit of one of the region's credit analysts to provide the standard accounting and payment practices within the industry to establish the

Holdings, Inc.), 476 B.R. 124, 141 (Bankr. D. Del. 2012) (quoting Forklift Liquidating Trust v. Custom Tool & Mfg. Co. (In re Forklift LP Corp.), 340 B.R. 735, 739 (Bankr. D. Del. 2006)). Post-BAPCPA, courts must consider "more than just the standards of the creditor's industry." Nat'l Gas Distribs. v. Branch Banking & Trust Co. (In re Nat'l Gas Distribs.), 346 B.R. 394, 404 (Bankr. E.D.N.C. 2006). Courts must also look to the standards of the debtor's industry and to "general business standards that are common to all business transactions in all industries." Id.

ARS argues that (as stated in its interrogatory responses) the preference payments it received from Anderson were "on terms which were not unusual when compared to the prevailing standards in Defendant's industry *at the time*[.]" (Br. D. 25).[11] ARS also argues that the payment terms were similar to those it experienced with other builders. Id. Davis Servoss, Anderson's CEO, testified at trial that "a 30 day payment window, with a 15 day grace period, were 'typical' payment terms with respect to what the Debtor experienced with other contractors." See Br. P. 22. Marie Crawford, a Division Controller for ARS, testified at trial that most builders would pay within 45 to 60 days for rough in work. See id. Even assuming that payment within 60 days was in accordance with the objective industry standard,[12] the preference payments from Anderson to ARS fall outside of these payment terms. During the preference period, the payment delays ranged from 82.17 days to 111.8 days after the purchase order or the invoice if all of the payments are considered,

---

standards of payment terms[.]" Queenscape, 2012 WL 5617446 at * 7 n.4 (quoting Angell v. Neff Rental, Inc., No. 06-00157-8-AP (Bankr. E.D.N.C. Jan. 23, 2008)).

[11] As cited in the ordinary course sections, "Br. D." refers to ARS's post-trial memorandum of law supporting judgment in its favor on the 11 U.S.C. § 547(c)(2) defense.

[12] Because both Anderson and ARS are involved in the construction business, it is not necessary to consider the industries of the parties separately.

and if the disputed entries are excluded, the payment delays ranged from 86.6 days to 109.25 days.[13]
See Br. P. 22. All of these delays are well outside of a 60-day payment term. ARS has not met its
burden under 11 U.S.C. § 547(g) of showing that the payments were made according to ordinary
business terms under § 547(c)(2)(B).

## CONCLUSION

Based on the foregoing, the court finds that ARS has not satisfied its burden of showing that
an adverse inference for spoliation of evidence is warranted and that the parties intended the
payments to be a contemporaneous exchange for new value. Therefore, it has not met its burden in
proving a contemporaneous exchange for new value defense under 11 U.S.C. § 547(c)(1). The
court also finds that ARS has not met its burden in proving that the payments were in the ordinary
course of business as required under 11 U.S.C. § 547(c)(2). Therefore, ARS's motion for sanctions
based on spoliation of evidence is **DENIED**, and the trustee is entitled to a judgment against ARS
in the amount of $122,861.66, plus interest at the federal rate of 0.17 percent per annum from June
28, 2011 until paid.

**SO ORDERED.**

## END OF DOCUMENT

---

[13] Again, even if the disputed entries are excluded, the average delay in payment does not
change materially and is still well outside a 60-day payment term.